IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:18CR0006 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| AESHA JOHNSON, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, Justin E. Herdman, United

States Attorney, and Matthew J. Cronin and Justin Seabury Gould, Assistant United States

Attorneys, hereby requests that this Court sentence Defendant Aesha Johnson in a manner

consistent with the seriousness of her criminal conduct, the risk of her recidivism, the harm that

she has caused to the victims in this case, and the danger that she poses to the public.  First, this

Court should adopt Pretrial Services determination that Defendant's Offense Level is 29.

Second, this Court should accept Pretrial Services criminal history points calculation of 12 and

depart upward one criminal history point, placing Defendant in Criminal History Category VI,

which more accurately reflects the "seriousness of the defendant's criminal history or the

likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3.  Third, given the

1

large number of victims and the significant harm that they suffered, this Court should run two or more of defendant's aggravated identity theft convictions consecutively to one another.  At a minimum, this Court should run Counts 16-18 (for Tax Year 2012) and Counts 19-29 (for Tax Years 2013) consecutive to one another and the overall sentence, as Defendant had an opportunity to desist between each tax year and instead committed another round of fraud.  The final calculation would place Defendant at an advisory Guidelines range of 151-188 months with 48 months added on to the sentence pursuant to 18 U.S.C. § 1028A.  Defendant final sentence should therefore be the high end of this Guidelines sentence – 236 months.

### Factual Background

From March 4 to 13, 2019, this Court presided over the criminal trial of Defendant Aesha Johnson.  The United States introduced thousands of pages of corporate, financial, court, county, and prison records establishing Defendant's guilt.  These include 17 identity theft affidavits relating to Defendant's victims.  (*See* Gov. Exs. 270-87).  During the course of the trial, over 24 witnesses testified for the United States.  These include 14 victims,[1] who testified that they never authorized Defendant to make these tax returns, that the tax returns were materially false, and that they received no material benefit from the proceeds of the returns.  The victims also testified that the identity theft caused significant hardship for them in receiving benefits, finding employment, and securing loans, in addition to a substantial emotional toll.  The United States additionally introduced evidence establishing that other individuals were also victims in this case, including Laangel Funches and Colleen Hart, who both passed away before trial.  The

---

[1] The victims who testified at trial were Sharronda Anderson, Toni Harris, Fred Warren, Brenda Greene, Marcia Perryman, Fredrick Medley, Karen Diamond, Charlsie Sumlin, Nola Porter, Erin Porter, Felicia Murrell, Simona Higdon Talley, Cheryl Taylor-Dukes, and Jacqueline Mitchem.

2

United States also published to the jury numerous tax documents, other records, and summary exhibits establishing other likely victims in this case.  The United States thus conclusively established nearly twenty victims at trial.

The United States introduced evidence establishing that many of these victims suffered "substantial financial hardship," as defined in the Guidelines.  This evidence includes witness testimony, documentary evidence from prior IRS identity theft affidavits, other evidence summarized in the Presentence Report, and victim impact statements.  As established at trial, the nature of Defendant's scheme was to target poor and marginalized victims who qualified for an IRS tax refund.  These individuals largely lacked the means to know that Defendant was using their identity, let alone to properly contest the identity theft.  A number of victims had other tragic situations or conditions that further cemented their status as vulnerable.  For instance, Brenda Greene suffered from bipolar disorder.  Felicia Murrell had mental health issues, such as schizophrenia.  Cheryl Taylor-Dukes was an incarcerated drug addict.  Toni Harris was in a fragile mental state at the time due to the untimely death of her mother.  Laangel Funches (and many others) were on Social Security Disability.

This Court heard testimony or saw other evidence establishing the impoverished conditions of many of these victims.  Evidence also established how vital government benefits and services were to them, and how Defendant's identity theft either prevented them from obtaining these benefits or at least temporarily put those benefits in jeopardy.  As a result, many of these victims suffered substantial financial hardship.  Many witnesses testified that Defendant's conduct resulted in the loss of benefits, employment opportunities and – at the very least – significant tax refunds that were critical to them due to their marginalized economic status.  The identity theft affidavits introduced at trial told a similar story.  (*See, e.g.* Ex. 270:

Identity Theft Affidavit of Sharronda Anderson ("my food stamps have been cut off"); Ex. 271: Identity Theft Affidavit of Cymone Bailey (inability to file tax return – and thus receive income tax return – due to Defendant's identity theft); Ex: 274: Identity Theft Affidavit of Laangel Funches (loss of Social Security Disability benefits because "the SSA indicated to my attorney that there is self employment income reported to IRS"); Ex. 275: Identity Theft Affidavit of Brenda Greene (Social Security withheld disability because "someone filed for a return in my name in 2012"); Ex. 279: Identity Theft Affidavit of Jacqueline Mitchem (stating that "Job and Family Services" – a government organization that provides benefits in Ohio – contacted her regarding her 2013 tax returns); Ex. 279: Identity Theft Affidavit of Felicia Murrell ("I was made aware that there has been returns filed under my social security number which have stopped all my benefits"); Ex. 282: Identity Theft Affidavit of Erin Porter (unable to file 2012 tax return – and thus receive an income tax refund – "because someone had previously filed a tax return with my name and social security number"); Ex. 283: Identity Theft Affidavit of Nola Porter ("I was informed by Social Security that tax returns have been filed in my name"); Ex: 286: Identity Theft Affidavit of Samona Talley ("I went to file my taxes [and] it got rejected cause someone filed me and my children")).

In addition, the United States introduced Defendant's own statements in Bureau of Prisons recorded phone calls and emails.  These calls and emails demonstrated Defendant's knowledge and control of the conspiracy.  (*See, e.g.*, Ex. 100T ("For every single thing, I know exactly what the number means…because I know it all.  I got who it go [to], who's what"); Ex. 122 "I'm sending Stan to pick up all my stuff from you!!!!!!! F*** it! I'll do the s**t myself!"); Ex. 127 ("we['] re a team, I'm the boss!")).  They also demonstrated Defendant's influence over

her daughter and co-conspirator, Brittany Williams.  For instance, in Government's Exhibit 104, Defendant wrote,

> this bulls**t is becoming more and more irritating!!!!!!!! i get 300 punk ass minutes per month and i keep jhaving [sic] to call you back about the same bulls**t! i ask [sic] a question a long ass time ago and the answer was incomplete Again im aking [sic] what's up w 5,6,15,16,18,20,24 !!!!!!!!!  f***! what's up with ms anderson and ms daily?  why the f*** didnt you order from somewhere else like rush or walmart if youve been waiting so long???????? i mean what the f***! why Do i have to think about simple s**t for you? you had all f****** summer ! but you didnt give a f*** you just said f*** me RIGHT! that's what youve shown me ! boy its not fun when the Rabbit has the Gun! You gone need me and you sure wouldnt like for me to do this same bulls**t w you! F****** GET IT TOGETHER AND STOP BULLS****ING BC YOUR PISSING ME OFF ! NOW ANSWER THE QUESTIONS AND DONT F****** LIE! WHAT THE F*** IS GOING ON W 5,6,15,16,18,20,24 AND THE REST! DONT KEEP DISAPPOINTING ME JUST GET IT F****** DONE!!!!!!!!!!!!!!!!!!!

(Gov. Ex. 104; *see also* Gov. Ex. 113T (B. Williams: "I had a study review, I think and then I went…" A. Johnson: "I don't, I don't f***ing care about it.  Just what happened to the email what you were sending me before that?")).

This Court did not allow Count 30 (witness tampering) to proceed to the jury, due to the fact that the United States did not call Brittany Williams to testify.  The jury convicted Defendant on all other counts.

<u>**Law and Argument**</u>

## I.    <u>Defendant's Offense Level is 29</u>

### A.  **Defendant's Loss Amount is over $285,000 (U.S.S.G. § 2B1.1(a) & (b)(1)(G))**

Defendant was charged with wire fraud, which has a statutory maximum term of imprisonment of 20 years or more.  Her base offense level is thus 7.  Under U.S.S.G. § 1B1.3, a defendant is responsible for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. § 1B1.3.  That is especially true where, as here, there is significant evidence tying the returns together as part of

the "same course of conduct" or "common scheme or plan." *Id.* As reflected in evidence introduced at trial and recited in the First Presentence Report, Defendant's total loss amount is $285,922. ECF No. 96: First Presentence Report, PageID 714; U.S.S.G. § 2B1.1, Note 3 ("loss is the greater of actual loss or intended loss").[2] The evidence includes the testimony of IRS Special Agent Richard Kushan and various government exhibits, including the hundreds of pages of tax records and Government Exhibit 721, a summary exhibit of all tax returns agents tied to Defendant's crime through various indicia (prior or recurring victim, common IP, common address, refund issued to affiliated cards, etc.). Defendant's loss amount increases her offense level by +12.

### B. At Least Five of Defendant's Victims Suffered "Substantial Financial Hardship" (U.S.S.G. § 2B1.1(b)(2)(B))

The Guidelines states, "if the offense […] resulted in substantial financial hardship to five or more victims," then a 4-point enhancement is appropriate. U.S.S.G. § 2B1.1(b)(2)(B). The Guidelines provide a non-exhaustive list of what may qualify as "substantial financial hardship" in § 2B1.1, Note 4(F). Courts have elaborated on this list, with numerous courts finding conduct significantly less egregious than the instant offense qualifying for the enhancement. In *United States v. Poulson*, the Third Circuit found that "substantial financial hardship is subject to the usual—and significant—degree of discretion afforded a district court during sentencing." 871 F.3d 261 (3d Cir. 2017). In particular, it found,

> [B]etween a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to charity), and a devastating loss (occurring in the wake of a scheme to wipe out a victim's life savings), there lies a wide

---

[2] *See also* U.S.S.G. § 2B1.1, Note 3(A)(ii) ("'Intended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)).

range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4(F).  In the end, this is just one more determination of a fact that bears on the ultimate sentence; that determination is entitled to the normal deference that applies to all facts found at sentencing.

*Id.* at 268 (alteration in original) (quoting *United States v. Minhas*, 850 F.3d 873, 878 (7th Cir. 2017)).  *United States v. Brandriet*, 840 F.3d 558, 561-62 (8th Cir. 2016) (even though direct evidence of substantial financial hardship was thin, district court did not err in finding substantial financial hardship based on inferences drawn from the evidence).

When evaluating whether a fraud caused a "substantial financial hardship," courts have consistently held that the most salient factor is the effect of the fraud on the victim, rather than the dollar loss put in vacuum.  As explained in *Poulson*, "we ought to consider not only the pecuniary value of the loss but also such intangibles as its impact on the victim."  *Poulson*, 761 F.3d at 269; *id.* at 268 (substantial financial hardship "is measured on a sliding scale that is also fairly subjective").

In *United States v. Castaneda-Pozo*, the Eleventh Circuit found that, even when monetary loss was minimal, a defendant who "made his victims insecure in life's basic necessities" qualified for the enhancement.  877 F.3d 1249, 1252-53 (11th Cir. 2017).  The defendant in *Castenada-Pozo* stole money from drop boxes around the time when rent checks were normally due.  The court found that stealing the rent checks around the time when rent was due caused "substantial financial hardship," even though no victims were actually evicted.  *Id.* at 1252.  That is because the victims ran the risk of losing their basic necessities, such as food and housing.

In this case, Defendant preyed on those on the margins of society.  These individuals heavily relied upon tax returns and benefits (disability, housing, etc.) to meet their basic needs.  Victims testified that their benefits were jeopardized and that they lost the opportunity to receive tax refunds that were lawfully owed to them.  Even putting aside the testimony, the

7

identity theft affidavits entered into evidence demonstrate that far more than five victims suffering substantial financial hardship.  (*See, e.g.* Ex. 270: Identity Theft Affidavit of Sharronda Anderson ("my food stamps have been cut off"); Ex. 271: Identity Theft Affidavit of Cymone Bailey (inability to file tax return – and thus receive income tax return – due to Defendant's identity theft); Ex: 274: Identity Theft Affidavit of Laangel Funches (loss of Social Security Disability benefits because "the SSA indicated to my attorney that there is self employment income reported to IRS"); Ex. 275: Identity Theft Affidavit of Brenda Greene (Social Security withheld disability because "someone filed for a return in my name in 2012"); Ex. 279: Identity Theft Affidavit of Jacqueline Mitchem (stating that "Job and Family Services" – a government organization that provides benefits in Ohio – contacted her regarding her 2013 tax returns); Ex. 279: Identity Theft Affidavit of Felicia Murrell ("I was made aware that there has been returns filed under my social security number which have stopped all my benefits"); Ex. 282: Identity Theft Affidavit of Erin Porter (unable to file 2012 tax return – and thus receive an income tax refund – "because someone had previously filed a tax return with my name and social security number"); Ex. 283: Identity Theft Affidavit of Nola Porter ("I was informed by Social Security that tax returns have been filed in my name"); Ex: 286: Identity Theft Affidavit of Samona Talley ("I went to file my taxes [and] it got rejected cause someone filed me and my children")).

This Court should therefore apply the +4 enhancement under U.S.S.G. § 2B1.1(b)(2)(B).

### C.  Defendant was a Leader and Organizer (U.S.S.G. § 3B1.1)

The Presentence Report accurately describes Defendant as a leader and organizer. Defendant clearly led the conspiracy and had control over her co-conspirator and daughter, Brittany Williams.  (*See, e.g.*, Ex. 100T ("For every single thing, I know exactly what the number means…because I know it all.  I got who it go [to], who's what"); Ex. 122 "I'm sending

Stan to pick up all my stuff from you!!!!!!! F*** it! I'll do the s**t myself!"); Ex. 127 ("we['re a team, I'm the boss!").

This Court should therefore apply the +2 enhancement pursuant to U.S.S.G. § 3B1.1.

### D.  Defendant Abused a Position of Public and Private Trust (U.S.S.G. § 3B1.3)

Under U.S. Sentencing Guidelines § 3B1.3, "[i]f the defendant abused a position of **public <u>or</u> private** trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."  U.S.S.G. § 3B1.3 (emphasis added).  Defendant qualifies for the Abuse of Position of Trust enhancement on two grounds.  First, Defendant maintained a position of private trust with victims who were her family members, such as Marcia Perryman and Fredrick Medley.  Second, Defendant, through her deception, utilized a position of public trust with many other victims by posing as an individual with significant tax preparation expertise.

The Sixth Circuit has held that taking advantage of family members in a fraud case qualifies a defendant for the "abuse of private trust" enhancement under U.S.S.G. § 3B1.3.  In *United States v. Sedore*, the Sixth Circuit affirmed the application of the enhancement for a defendant who committed identity theft using the identities of a close friend's children.  512 F.3d 819 (6th Cir. 2008).  The Sixth Circuit held that, while defendant was not technically a family member of the children, the trust that the father of the victim-children placed on defendant was sufficient to impute that relationship of private trust onto him.  *Id.* at 825-26.  Other courts have affirmed the application of the enhancement when defendants use their position of trust as a family member or close friend to perpetrate the crime.  *See, also United States v. Pacheco-Martinez*, 791 F.3d 171, 178 (1st Cir. 2015) ("We may also consider whether the defendant used a personal relationship with the victim in order to facilitate the fraud").  In this case, Defendant

took advantage of multiple family members – convincing them that Defendant should file tax returns on their behalf and that they would receive the benefit.  At trial, Defendant's aunt and uncle – Marcia Perryman and Fredrick Medley – both testified on behalf of the United States.  The witnesses explained that they gave their personal identifying information to Defendant due to the trust they placed in her as a family member.  They also testified that, for certain years, they did not receive all or part of the tax refunds issued in their name.  Documentary evidence confirmed this testimony.  Given the holding in *Sedore*, Defendant qualifies for the § 3B1.3 enhancement.

Defendant separately also qualifies for the enhancement by falsely assuming a position of public trust.  As stated in the Guidelines, "this adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."  U.S.S.G. § 3B1.3, Note 3.  Thus, "in making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately."  *Id.*  At trial, multiple victim witnesses, such as Toni Harris, testified that Defendant approached them, represented herself as a women of means with financial and tax expertise, and convinced them to provide their personal identifying information to her in exchange for her applying for taxes on their behalf or some similar benefit.  Thus, because she imputed that position of public trust falsely onto herself, Defendant must receive this enhancement at sentencing.

This Court should therefore apply the +2 enhancement under U.S.S.G. § 3B1.3.

### E.  Defendant Obstructed or Impeded the Administration of Justice (U.S.S.G. § 3C1.1)

There is a sufficient record to establish by a preponderance of the evidence that Defendant's conduct relating to her co-conspirator and daughter, Brittany Williams, qualifies Defendant for the enhancement under U.S.S.G. § 3C1.1.  The Guidelines states that the following conduct qualifies for the "Obstructing or Impeding the Administration of Justice" enhancement:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1  The Court acquitted Count 30 pursuant to Rule 29, because the United States elected not to have Brittany Williams testify at trial.  Pretrial Services correctly stated in the Final Presentence Report that this has no bearing on the Court's sentencing determination for obstructive conduct.  As the Supreme Court held in *United States v. Watts*, "A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." 519 U.S. 148, 156-57 (1997) ("An acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government fails to prove an essential element of the offense beyond a reasonable doubt.  Without specific jury findings, no one can logically or realistically draw any factual finding inferences"); *see also United States v. White*, 551 F.3d 381, 382 (6th Cir. 2008) ("acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *United States v. Hensley*, 5 Fed.Appx. 261 (4th Cir. 2001) (unpublished) (affirming sentencing court's application of the obstruction of justice enhancement at sentencing after an

acquittal on the obstruction of justice count at trial); *United States v. Brika*, 487 F.3d 450 (6th Cir. 2007) (same).

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This Court has sufficient evidence – before it both from trial and now for the first time in evidence contained in the Final Presentence Report –to find that Defendant's conduct qualifies for the U.S.S.G. § 3C1.1 enhancement.

First, consider the five lies that this Court heard Williams gave to law enforcement at the first proffer:

1. Aesha Johnson was not involved in tax fraud;

2. Aesha Johnson never told Williams to commit tax fraud;

3. Aesha Johnson never provided IDs to Williams;

4. Aesha Johnson never called or emailed about criminal activity;

5. Williams and a dead man (Lanier) did everything.  Aesha Johnson had nothing to do with it.

As proven at trial, none of those statements were true.  Defendant's own voice and words in recorded calls and emails demonstrate the exact opposite.  The only person who had a motive for Williams to say those specific lies – lies whose only purpose was to falsely exonerate Defendant – was the Defendant herself.  The evidence established that Defendant played a critical role in Williams' behavior during the first proffer.  Defendant was the one who dropped Williams up and picked her up from the proffer.  Defendant was the one who texted Williams to "record" the entire conversation with federal agents and to "just try to remember" the lies Defendant wanted

Williams to tell.  Defendant was the one who took Williams from the courthouse as soon as federal agents played a few recordings of Defendant discussing the scheme to Williams.

Second, this Court heard testimony from Special Agent Kushan that Williams admitted that all of these statements were lies when she obtained new counsel and after her mother was incarcerated.  In other words, once Defendant was no longer available to influence her, Williams admitted that the lies that *solely benefitted Defendant* were not true.  Special Agent Kushan also testified that Williams' demeanor was different.  In the first meeting, she was anxious and checking her phone.  In the second meeting, after Defendant's incarceration and with a new attorney, she was crying and "open" about what had happened.

Third, the United States also put on significant evidence establishing Defendant's control over Williams.  These include Defendant's own recorded statements belittling and threatening her daughter for not complying with her criminal demands.  This Court also heard testimony from others who observed how Defendant controlled Williams, with Bowling Green Police Department Sergeant Hartman testifying that she acted as a "gatekeeper" that prevented law enforcement from interacting with Williams in a conflict-free manner until Williams obtained her own counsel.

After trial, Pretrial Services uncovered other significant evidence establishing this abusive relationship and overwhelming control over Williams.  In particular, Pretrial Services uncovered evidence that Defendant physically and mentally abused Williams throughout her childhood.  *See, e.g.*, ECF No. 99: Final Presentence Report, PageID 776 ("individual reported to caseworkers that the defendant had Brittany sprawled across the bathroom and was hitting her, swearing at her, threatening to hurt her more, and in a rage"); *id.* ("On another date in 2010, there were allegations that the defendant was physically abusive towards Brittany Williams.  The

13

defendant was punching and kicking at her head to try and remove her from her father's vehicle. Brittany was taken to the hospital with lacerations to her head and did not want to return to her mother's care for fear of being beat by her mother.") (emphasis added).  This type of abuse again demonstrate the reasonable fear that Williams would have in this instance that led her to lie on her mother's behalf.[3]

Finally, Defendant's obstructive conduct was entirely consistent with how Defendant acted throughout the investigation.  Everything that Defendant did was designed to hide the truth of her criminal behavior from law enforcement.  It is entirely reasonable to find that she would act in a consistent manner when law enforcement was questioning her daughter about her criminal scheme.  There is no other logical reason for Williams to make statement that inculpated herself and solely exculpated the Defendant.

In short, Defendant was the only person who (1) benefitted from Williams' lies (i.e., the obstructive conduct); (2) had that level of control over Williams; and (3) had an established pattern of deception that was entirely consistent with Defendant having Williams lie to law enforcement.  That is sufficient evidence to establish the obstruction enhancement by a preponderance of the evidence.  If this Court declines to apply the obstruction enhancement, given all of the underlying facts – history of abuse, using a near-minor to commit a crime, committing the crime using her daughter while in prison,[4] obstructive behavior, and so on – the

---

[3] This Court should also consider the psychological level of control that Defendant had over Williams, given her young age.  Defendant involved Williams in the conspiracy right around the time that she turned 18.  This is another potential ground for a higher sentence.  *See* U.S.S.G. § 3B1.4 – Using a Minor to Commit a Crime.

[4] Defendant's actions – committing a fraud against many of the same victims *while imprisoned for the same type of crime* – are so audacious that the Guidelines do not even contemplate them. The U.S. Sentencing Commission has crafted a number of enhancements and upwards departures for similar facts.  For instance, under § 2D1.1(b)(4), the Guidelines require a +2 offense level

United States respectfully requests that this Court nonetheless depart upwards two points to encapsulate this egregious behavior.

## II.    Defendant's Criminal History "Substantially Underrepresents the Seriousness of Defendant's Criminal History or the Likelihood that Defendant will Commit Other Crimes"

Defendant currently has 12 criminal history points, putting her one point below Criminal History Category VI.  Several of her prior convictions do not score due to length of time.  The Guidelines expressly contemplates an upward variance for individuals whose criminal category substantially "underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3.  The Sixth Circuit has affirmed this practice.  *See United States v. Bennett*, 975 F.2d 305, 310 (6th Cir. 1992) (affirming upward departure of criminal history under U.S.S.G. § 4A1.3 based on defendant repeatedly committing the same type of offenses); *United States v. Fountain*, 2 F.3d 656, 669 (6th Cir. 1993) (same); *United States v. Hoyt*, 86 F. App'x 924, 926 (6th Cir. 2004) (unpublished) (court did not abuse its discretion when varying from criminal history category III to V).  Given Defendant's serial recidivism and inability to stop committing the same crimes even while incarcerated, this criminal history category underrepresents her risk of recidivism.  The United States therefore respectfully requests that this Court depart upward one criminal history point to 13, putting Defendant in Criminal History Category VI.

### A.  Defendant's History of Recidivism

Defendant's history of unlawful conduct began long before this case.  As a result, Magistrate Judge Parker, this Court, and the Sixth Circuit have all independently held that

---

enhancement for committing drug trafficking in prison.  It did not contemplate committing fraud *using the prison's communication system* while hiding behind the protection of prison walls.

Defendant is a serial fraudster with a high chance of recidivism who is a danger to the public. (*See* ECF No. 19: Order of Detention, PageID 72 ("The defendant has a lengthy history of violating the terms of supervision. She has committed new offenses while under supervision"); ECF No. 30: Order, PageID190 (same); *United States v. Johnson*, 2018 U.S. App. LEXIS 26385, (6th Cir. Sep. 17, 2018) ("In this case, where Johnson has repeatedly victimized the same people, she is a danger to the community and potential witnesses").

Before her indictment in the present case, Aesha Johnson had been convicted of more than a dozen other crimes. (ECF No. 50-1: Pretrial Services Report, PageID 247, 251-254 (Under Seal); ECF No. 96: First Presentence Report, Page ID 708, 717-724). At least four of these were felony convictions. (ECF No. 96: First Presentence Report, Page ID 708, 717-724). Defendant also committed numerous substantive probation violations. In total, Defendant committed more than 15 serious violations during periods that she was under court supervision. (*Id.*). On one occasion, she removed her location-monitoring device and absconded. (*Id.*). She committed eight crimes, including multiple fraud-based felonies, two of which resulted in federal felony fraud convictions. (*Id.*). She targeted many of the same persons who she had victimized before while committing these new crimes. (*Id.*).

Further analysis of Defendant's history demonstrates her danger to the public, disrespect of the law, and significant likelihood of recidivism. 18 U.S.C. § 3553(a). In 2008, Johnson pled guilty in federal court to violating 18 U.S.C. § 1512, Concealment of Assets in Bankruptcy, and received a probationary sentence. (ECF No. 96: First Presentence Report, Page ID 708, 717-724*, PageID 718-20). About two weeks after sentencing, the Probation Department notified the court that Johnson had violated the conditions of her probation by making false statements. (*Id.*). U.S. District Court Judge Sara Lioi found her in violation, adding several new restrictions in an

attempt to ensure her compliance.  Shortly thereafter, Johnson violated these new conditions, all of which had been designed to prevent her from continuing to commit fraud.  (*Id.*).  Judge Lioi found Johnson in violation again, but still continued her probation.  (*Id.*).

While on probation with Judge Lioi, Johnson committed more state crimes.  Two were felonies relating to fraud.  First, in March 2010, Johnson pled guilty to committing Forgery, Forging Identification Cards, and Attempted Tampering with Records.  (*Id.*, PageID 721).  On October 7, 2010, Judge Lioi found Johnson in violation of her probation for a fourth time, revoked her supervised release, sentencing her to three months in prison.  (*Id.* at 718).  Second, Defendant pled guilty to Aggravated Theft and Tampering with Records.  After pleading guilty, she failed to appear, with law enforcement finding and arresting her four months after her change of plea hearing.  (*Id.* at 721)  The court again imprisoned her.  After a few months, however, the state court granted Johnson early release and placed her on community control for five years. (*Id.*).

As revealed in the detention hearing, around this time, Defendant lived with Cleveland Police Detective James Brooks, a family friend.  (ECF No. 23: Detention Hrg, Trans., PageID 87, 93).  While on the stand, Detective Brooks admitted that he "was not aware" of several crimes that Defendant committed during that same time.  (*Id.*, PageID 110).  Those crimes included federal tax fraud, which the Detective admitted was "right around the same time period" as Johnson's stay with him.  (*Id.*).

While on community control for the state fraud charge, Johnson committed three more crimes.  The first two were criminal trespass and disorderly conduct, committed on or about February 2011 and March 2011, respectively.  (ECF No. 96: First Presentence Report, Page ID 722).  The third was federal tax fraud, with federal authorities arresting her for the crime on

April 9, 2012.  Johnson pled guilty and, on October 15, 2012, Judge Gwin sentenced her to 21 months imprisonment and two years of supervised release.  (*Id.*).  On December 12, 2012, while on bond before the court imposed her sentence, Johnson removed her location-monitoring device and absconded for several days.  As detailed in the Pretrial Services Report, the Pretrial Services Officer called the phone number that Johnson had provided multiple times, with no answer. (ECF No. 50-1: Pretrial Services Report, PageID 254-255).  The Officer surveilled the surrounding community and went to Johnson's home.  Her family stated that they did not know where she went.  (*Id.*, PageID 155).  Johnson later reported to FCI Alderson on January 2, 2013. (*Id.*).  Neither Pretrial nor law enforcement ever ascertained what Johnson did during that time.

As proven at trial, Johnson continued committing crimes while in prison.  In particular, she continued the scheme of using victim identifiers to file for and then acquire tax refund checks from the Internal Revenue Service.  As part of this scheme, she targeted many of her prior victims from Judge Gwin's 2012 tax fraud case.

Upon release from prison, Defendant was sent to a halfway house.  As stated in the Pretrial Services Report, Defendant "did poorly at the halfway house and received numerous violations."  (ECF No. 96: First Presentence Report, Page ID 723).

In August 2016, during the pendency of the present case, Judge Gwin found Johnson in violation of her supervised release conditions based on her conviction for obstructing official business while on supervision and her failure to pay restitution to her victims.  (1:12-CR-165 – ECF No. 43: Order, PageID 262).  She originally owed $76,340.61 to her victims.  (1:12-CR-165 – ECF No. 45: Supervision Report, PageID 267).  Upon her release to the time of her incarceration, Defendant paid just over $1,000 in restitution to the victims.  She still owes over $75,000.  (ECF No. 96: First Presentence Report, Page ID 723).

After she was convicted in 2012 of tax fraud for using victims' identities, she committed identity theft fraud again against many of the same victims, as reflected in the present case.  (*Id.*). All federal judges who supervised Johnson previously revoked her supervision and incarcerated her based upon repeated violations and continuous felonious activity.  (*Id.*).

## B. Defendant's History of Recidivism and the Fact that She Repeatedly Committed the Same Crimes Even While Imprisoned Demonstrates that Her Criminal History Underrepresents the Danger She Poses to the Public

Defendant has consistently committed crimes from at least the age of 18 onwards.  She has repeatedly flaunted the authority of the courts, committing crimes while on probation and even while imprisoned.  There is no evidence that she will stop.  To the contrary, there is an extremely high likelihood that Defendant will commit other crimes.  That is the most consistent feature of her adult life, as attested by her over a dozen criminal convictions and over 15 probation violations.

Defendant's Criminal History Category also insufficiently encapsulates the risk of recidivism when considering the serial nature of the scheme.  Defendant's conduct was extraordinary in its audacity and callousness.  As proven at trial, Defendant was convicted of committing stolen identity refund fraud before Judge Gwin in 2012.  While she was incarcerated in a federal prison, Defendant engaged in *the same criminal scheme*, often using the same victims.  Over time, she broadened the scope, including new victims and making more false tax filings.  In order to perpetrate the scheme from prison, she brought Brittany Williams – her high-school-age daughter – into the scheme.  Defendant convinced and harassed Williams into committing numerous overt acts in furtherance of the conspiracy, all while Defendant controlled the scheme from prison.  On calls and emails, Defendant demonstrated an overwhelming level of control over her daughter, threatening that she would cut off Williams if she did not comply with

her requests.  Upon leaving prison, Defendant continued to commit the scheme, with evidence presented to the jury showing her discussing using the same identifiers *again* to commit fraud well after she left federal custody.

This case is the latest in a long line of fraud, deceit, and criminality dating back to when Defendant was 18 years old.  Defendant has never changed for the better.  She has only increased both the scope and sophistication of her schemes.  There is no reason to think anything will be different this time.  Both the Guidelines and the Sixth Circuit expressly approve upward departures in these instances.  *See* U.S.S.G. § 4A1.3; *Bennett*, 975 F.2d at 310.  The United States therefore respectfully requests that this Court depart upward one criminal history point to 13, putting Defendant in Criminal History Category VI.

### III.  Two or More of Defendant's Aggravated Identity Theft Convictions Should Run Consecutively to One Another

The United States requests that this Court impose multiple 18 U.S.C. § 1028A sentences consecutive to one another.  Where a defendant has multiple convictions under §1028A, the district court has discretion to determine whether these sentences should run concurrently or consecutive with each other.  *United States v. Dvorak*, 617 F.3d 1017 (8th Cir. 2010) (citing 18 U.S.C. § 1028A(b)(4)).  A district court's sentencing decision is reviewed "under the deferential abuse-of-discretion standard."  *Gall v. United States*, 552 U.S. 38, 41 (2007).  A "district court's decision to impose a consecutive or concurrent sentence is reviewed only for reasonableness."  *United States v. Lee*, 545 F.3d 678, 680 (8th Cir. 2008) (affirming district court running three 18 U.S.C. § 1028A sentences consecutive to one another and the underlying sentence).  However, a

"district court must exercise that discretion 'in accordance with any applicable guidelines and policy statements issued by the Sentencing Commission.'" *Id.*[5]

Courts routinely impose 18 U.S.C. § 1028A sentences consecutive to one another for a variety of reasons.  In *United States v. Angelique Bankston*, this Court ran two 18 U.S.C. § 1028A convictions consecutive to each other and the underlying sentence, resulting in an addition 48 months added to the sentence.  *United States v. Bankston*, Case No. 1:13-CR-166 (Judgment & Conviction).  Just as in this case, the defendant in Bankston was a serial fraudster who defrauded a number of victims.  This Court held that, even though the fraud charges were groupable, the nature and seriousness of the offense, defendant's risk of recidivism, and other 18 U.S.C. § 3553(a) factors weighed in favor of running these sentences consecutively.

Other courts consistently reach the same result when confronted with similar facts.  For instance, in *United States v. Dvorak*, a defendant submitted false Medicaid claims in the names of children for whom defendant did not treat.  617 F.3d at 1017.  The district court found that running all Aggravated Identity Theft convictions concurrently did "not capture all of the harm" because it would punish the defendant "the same as an offender who stole the identity of one victim and used it one time."  *Id.* at 1028.  The circuit court affirmed a district court's imposition of two Aggravated Identity Theft counts consecutively, finding that the district court sufficiently

---

[5] U.S.S.G.§5G1.2, Application Note 2(B) requires the district court to put into the record its consideration of at least three factors in determining whether to run the sentences consecutively, or stack them: (1) "the nature and seriousness of the underlying offenses"; (2) whether the underlying offenses are groupable under U.S.S.G.§3D1.2; and, (3) "whether the purposes of sentencing set forth in 18 U.S.C.§ 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence."  As explained herein, both the nature and seriousness of the offense and the purposes of 18 U.S.C. § 3553(a)(2) are better achieved with a consecutive sentence.  Courts also routinely impose consecutive sentences in cases such as these, even if the charges are groupable.

made a record of its analysis based on both 18 U.S.C. § 1028A and U.S.S.G. § 5G1.2.  *Id.* at 1029 (noting that it was not required for the court to expressly consider the Guidelines factor that the convictions are groupable).  *See also United States v. Collins*, 640 F.3d 265 (7th Cir. 2011) (affirming running two 18 U.S.C. § 1028A convictions consecutively to each other and to the overall sentence, due to Defendant's high rate of recidivism and danger to the public); *United States v. Samuel*, 605 F. App'x 39, 40 (2d Cir. 2015) (unpublished) (affirming district court's sentence running two 18 U.S.C. § 1028A convictions consecutive to one another, due to the high dollar value); *United States v. Garrett*, 407 F. App'x 645 (4th Cir. 2011) (unpublished) (affirming running two 18 U.S.C. § 1028A convictions consecutively to each other and to the overall sentence, based on $90,000 fraud against a single victim); *United States v. Doe*, 536 F. App'x 871 (11th Cir. 2013) (unpublished) (affirming running four 18 U.S.C. § 1028A convictions consecutively to each other and to the overall sentence, based on longstanding fraud against a single victim).

Many of the defendants in these cases had criminal history and offense conduct that were far less egregious than Defendant's in the present case.  Defendant ran a multi-year tax and identity fraud scheme from a federal prison, taking advantage of numerous victims over the course of years with a callous disregard to the harm that they would suffer.  Defendant also clearly does not care that her actions have seriously harmed others.  Throughout this process, Defendant demonstrated no remorse for the harm she caused victims.  For instance, Defendant did not express regret for filing a false power of attorney for Toni Harris, giving Defendant not only full access to Harris' identity and finances, but also literal control of Harris' life and death if she ever was seriously injured.  Defendant purposely preyed on the poor, vulnerable, and marginalized, with an utter disregard for the financial, mental, and emotional damage she was

inflicting on so many victims.  Even her statement for supposed acceptance of responsibility in the PSR failed to mention the victims and continually minimized her role.

Defendant victimized those who have so little, even though Defendant already had so much.  This Court heard the testimony of Defendant's dresses matching her cars, driving in Hummers, and sating her own expensive tastes.  This Court is aware that Defendant – despite living a lavish lifestyle through the years – has not even paid $1,000 in restitution to the victims from her last federal case.

Failing to run sentences of 18 U.S.C. § 1028A consecutively to one another would evaluate Defendant in the same light as a criminal who committed one identity theft on one occasion.  *Dvorak*, 617 F.3d at 1017.  Due to her exceptionally high risk of recidivism, lack of remorse, danger to the public, and seriousness of the offense, the United States respectfully requests that the Court run multiple 18 U.S.C. § 1028A sentences consecutive to one another, in addition to consecutively to the sentence.  At a minimum, the 18 U.S.C. § 1028A convictions for the 2012 Tax Years (Counts 16-18) should run consecutive to the 18 U.S.C. § 1028A convictions for the 2013 Tax Years (Counts 19-29), as Defendant had ample opportunity to desist in between each Tax Year, and refused to do so.

## Conclusion

With Offense Level 29 and Criminal History Category VI, Defendant falls within the Guidelines range of 151-188 months.  In order to protect the public, promote respect for the law, and give some sense of justice to the victims in this case, the United States respectfully requests that this Court vary above the Guidelines range or, in the alternative, sentence Defendant to the highest level within that range.  In addition, the United States requests that the Court sentence the 2012 and 2013 tax year Aggravated Identity Theft counts of conviction consecutively, resulting

in four years added to the sentence.  There is no other means to prevent Defendant from continuing in her lifelong criminal career and harming more victims.  This Court should therefore sentence Defendant to 188 months with 48 months (two of the 18 U.S.C. § 1028A convictions) consecutive to the sentence, resulting in a 236 months sentence.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

/s/ Matthew J. Cronin
Matthew J Cronin (VA: 80267)
Justin Seabury Gould (OH: 0084584)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3995/3869
(216) 522-7499 (facsimile)
Matthew.Cronin@usdoj.gov
Justin.Gould@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2019, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Matthew J. Cronin
Matthew J. Cronin
Assistant U.S. Attorney